DODD, MEAD & COMPANY, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 94757. Promulgated February 28, 1941.

*R. L. P. Wallace*, Esq., and *Jacob Kirschenbaum*, Esq., for the petitioner.

*S. U. Hiken*, Esq., for the respondent.

OPINION.

HARRON: The basic questions are whether petitioner realized gain or sustained loss on the disposition of its remaining 225 shares of class A preferred stock of Blue Ribbon in the taxable year, and the amount of such gain or loss.

In a statement attached to its income tax return for the taxable year petitioner stated that it had sustained a loss of $5,000 from the sale of 225 shares of class A preferred stock of Blue Ribbon; that it had purchased the shares on June 18, 1933, at a cost of $22,500 and had sold the shares on November 30, 1935, for $17,500; that it had realized a gain of $2,520.73 from all other sales of stock; and that thus it had sustained a net loss of $2,479.27 from all sales of stock. In accordance with the limitations imposed by section 117 (d) of the Revenue Act of 1934 petitioner reported a capital loss of $2,000 on its income tax return for the taxable year.

In the statement attached to the deficiency notice respondent disallowed the capital loss of $2,000 and determined that petitioner had realized a profit of $12,777.78 from the sale of the 225 shares of class A preferred stock. Respondent added together $12,777.78, the profit from the sale in question, and $2,520.73, the profit from all other sales, and included the total of $15,298.51 in petitioner's gross income.

The answer to the question is to be found, in large part, in an analysis of both the transactions in which petitioner acquired the 225 shares of class A preferred stock in 1933 and the transactions in which petitioner disposed of the 225 shares in the taxable year. The transactions in which petitioner acquired the 225 shares in 1933 will be analyzed first.

Petitioner contends that in 1933 it sold to Reynal its entire interest in Blue Ribbon, consisting of 50 shares of old common stock and 50 shares of old preferred stock, for $30,000 and was paid $5,000 in cash and $25,000 in 250 shares of class A preferred stock of Blue Ribbon. The substance of petitioner's argument is that in May 1933 it, as well as each of the three other publishers, contracted to sell its

old common and preferred stock to Reynal for $30,000; that Reynal thereupon became the equitable owner of all of the old stock of Blue Ribbon and all the new stock thereafter issued; and that, as the owner of the Class A preferred stock of Blue Ribbon, Reynal caused the issuance of 250 shares thereof to petitioner in payment of $25,000 of the total purchase price of $30,000.

Respondent contends that in 1933 petitioner sold to Reynal only its 50 shares of old common stock after it had received a stock dividend thereon of 177⅞ shares of class A preferred stock. Respondent argues in substance that the proposal made by Reynal and Henry and accepted by petitioner and the three other publishers contained the entire contract between those parties; that under the proposal petitioner did not contract to sell to Reynal its 50 shares of old preferred stock but was to receive in exchange therefor 50 shares of class A preferred stock; that under the proposal petitioner was to receive a dividend on its 50 shares of old common stock payable in 177⅞ shares of class A preferred stock prior to the sale of its old common stock to Reynal; and that under the proposal, after the receipt of the above stock dividend, petitioner was to sell its 50 shares of old common stock to Reynal for $5,000 in cash and 22⅞ shares of class A preferred stock which Reynal was to receive as a dividend on his 25 shares of old common stock.

In our opinion, petitioner did not sell its entire interest in Blue Ribbon to Reynal in 1933 but sold only its 50 shares of old common stock, after it had received a stock dividend thereon of 177⅞ shares of class A preferred stock and after it had received 50 shares of class A preferred stock in exchange for its 50 shares of old preferred stock. These conclusions are supported by the provisions of the contract of sale itself, i. e., the proposal which was made by Reynal and Henry and accepted by the petitioner and the three other publishers. The proposal is stated to be an "offer to carry through a recapitalization and reorganization of Blue Ribbon" and contains no offer on the part of Reynal to purchase the entire interests in Blue Ribbon of petitioner and the three other publishers. The proposal outlines a series of steps to be taken in carrying through the "recapitalization and reorganization." The first step is the reclassification of the capital stock of Blue Ribbon; the second step is the transfer of $80,000 from surplus to capital and the declaration of a dividend on the old common stock payable in class A preferred stock at the rate of 3⅝ shares for one share of old common stock; the third step is the exchange of the shares of old preferred stock for the same number of shares of class A preferred stock; and the fourth step is the transfer of the old common stock of petitioner and the three other publishers to Reynal for $5,000 in cash each and

22⅔ shares of class A preferred stock each. Thus the contract of sale clearly provides only for the sale by petitioner to Reynal of its 50 shares of old common stock *after* the declaration of a dividend thereon in shares of class A preferred stock. Under the contract of sale Reynal never became the owner of the 50 shares of class A preferred stock, which petitioner received in exchange for its 50 shares of old preferred stock, and the 177⅞ shares of class A preferred stock, which petitioner received as a dividend on its 50 shares of old common stock; and it follows that such shares were not used by Reynal, as petitioner contends, to purchase its entire interest in Blue Ribbon.

Petitioner urges that evidence dehors the contract of sale shows that the parties to the sale in fact intended that petitioner and the three other publishers were to sell their entire interests in Blue Ribbon to Reynal in 1933. In our opinion, the evidence dehors the contract further strengthens the conclusion that in 1933 petitioner sold only its 50 shares of old common stock to Reynal, after it had received a stock dividend thereon of 177⅞ shares of class A preferred stock and after it had received 50 shares of class A preferred stock in exchange for its 50 shares of old preferred stock. In the course of the preliminary negotiations leading up to the contract, the parties apparently agreed that the entire interests in Blue Ribbon of petitioner and of the three other publishers were worth $30,000 each, or a total of $120,000. However, the parties were unable to enter into any contract for the sale of the entire interests of petitioner and the three other publishers for a total of $120,000 because Reynal could raise but a relatively small amount of cash. It was against this factual background that the proposal to carry through a recapitalization and reorganization of Blue Ribbon was devised. The obvious purpose of the recapitalization and reorganization was to enable Reynal to purchase the common stock of Blue Ribbon by reducing the value of the common stock through the transfer of $80,000 from surplus to capital and the declaration of a dividend on the common stock payable in class A preferred stock of the total par value of $80,000. The conclusion that in 1933 petitioner sold only its 50 shares of old common stock to Reynal *after* it had received a dividend thereon of 177⅞ shares of class A preferred stock finds further support in the testimony of Reynal himself. He testified that his offer to purchase the interests in Blue Ribbon of petitioner and the other three publishers was contained in the proposal submitted to petitioner and the three other publishers; that *"before any purchase was made* we took the surplus that was represented at that time as book value of the common stock * * * and we declared a stock dividend in preferred stock which meant that surplus instead of being represented by book value of

common stock then all was represented by a fixed value of par for preferred"; and that he *"purchased the common stock after this new preferred A was issued."* It thus was Reynal's understanding that he purchased only the old common stock of petitioner *after* a dividend had been declared thereon in class A preferred stock. In the light of the provisions of the contract of sale and the testimony of Reynal, little weight can be attributed to the statement made by petitioner's president that petitioner in 1933 sold "our interests, lock, stock and barrel for thirty thousand dollars." This statement was obviously a conclusion on the part of petitioner's president, who displayed much less familiarity with the transactions in question than did Reynal. Likewise, the fact that petitioner treated the transactions in question in its fiscal year ended January 31, 1934, as a sale of its entire interest in Blue Ribbon both on its books of account and on its income tax return is entitled to but little weight.

Petitioner next contends in substance that the certificates of class A preferred stock were evidences of indebtedness owed by Blue Ribbon and that thus the dividends in class A preferred stock which petitioner received in 1933 on its old common stock were taxable dividends.

An examination of the terms and conditions of the certificates of class A preferred stock leads to the conclusion that they were true certificates of ownership in Blue Ribbon and not evidences of indebtedness owed by Blue Ribbon. Dividends were payable "out of the net profits or surplus" of Blue Ribbon. See *Jewel Tea Co.* v. *United States*, 90 Fed. (2d) 451; *Commissioner* v. *Schmoll Fils Associated, Inc.*, 110 Fed. (2d) 611; *Haffenreffer Brewing Co.* v. *Commissioner*, 116 Fed. (2d) 465. Blue Ribbon had the option to retire the stock at any time in whole or in part on the condition that such retirement be made "only from surplus profits and without impairment of capital." It is true that Blue Ribbon was required to retire specified percentages of the entire issue each year over a six-year period, at the end of which the entire issue was to be retired. However, the certificates expressly stated that Blue Ribbon was to be bound by such retirement provisions only if retirement could be made "from surplus profits and without impairment of capital." Thus, Blue Ribbon "need not redeem any shares unless there was a surplus and only to the extent of that surplus", and "there was no time fixed when the holders could demand their money." *Jewel Tea Co.* v. *United States, supra.* It is also true that, in the event of a default for one year by Blue Ribbon in the payment of dividends or in the redemption of stock in accordance with the retirement provisions, "without regard to whether or not the failure to redeem is because the retirement

cannot be made from surplus funds or without impairment of capital", the holders of class A preferred stock were to have sole voting rights. However, it does not follow that in the event of such default the holders of class A preferred stock had sole power to dissolve Blue Ribbon. Cf. *Jewel Tea Co.* v. *United States, supra.* Section 51 of the New York Stock Corporation Law provides that "unless specifically excluded by the certificate of incorporation or other certificate filed pursuant to law from the right to vote in a proceeding * * * for voluntary dissolution pursuant to section one hundred and five, * * * all shares of stock shall be entitled to vote in every such proceeding." There is no evidence to show that the holders of the common stock in the event of such default were specifically excluded in the certificate amending the certificate of incorporation so as to reclassify the capital stock of petitioner from the right to vote in a proceeding for voluntary dissolution. Thus, in the event of such default, the holders of the common stock presumably would have the right to vote in a proceeding for voluntary dissolution, and section 105 of the New York Stock Corporation Law requires for "dissolution the vote of two-thirds of all shareholders entitled to vote." Cf. *Jewel Tea Co.* v. *United States, supra.*

Moreover, although in the event of dissolution or liquidation the class A preferred stock was to have priority over the class B preferred stock and the common stock, the class A preferred stock was not to participate in the assets available for distribution to general creditors but was to "participate in the assets available for distribution to *stockholders.*" Furthermore, there was no obligation on the part of Reynal, Henry, or Blue Ribbon dehors the certificates to pay dividends and to redeem the class A preferred stock in determined installments on dates certain over a period of years regardless of surplus profits. Cf. *Palmer, Stacy-Merrill, Inc.*, 39 B. T. A. 636; affd., 111 Fed. (2d) 809.

The conclusion that the certificates of class A preferred stock were true certificates of ownership in Blue Ribbon and not evidences of indebtedness owed by Blue Ribbon finds additional support in the fact that on its return for the taxable year petitioner included in gross income $2,025 as *dividends* received from Blue Ribbon, not as interest received, and then deducted that amount as *dividends* received from a domestic corporation under section 23 (p) of the Revenue Act of 1934; and also in the fact that all the checks delivered by Blue Ribbon to petitioner on account of dividends on the class A preferred stock expressly stated on their backs that they were in payment of *dividends* on the class A preferred stock. Moreover, the testimony of petitioner's president indicates that the parties to the contract of sale wished to

avoid the issuance of "notes" by Blue Ribbon because they believed that the issuance of such notes would cripple the business of Blue Ribbon.

It follows that the certificates of class A preferred stock were true certificates of ownership in Blue Ribbon and that the dividend declared on the old common stock in class A preferred stock was a true stock dividend. Under section 115 (f) of the Revenue Act of 1932 the 177⅞ shares of class A preferred stock which petitioner received as a dividend on its old common stock were not subject to tax. *Helvering v. Gowran*, 302 U. S. 238.

With respect to the transactions in the taxable year in which petitioner disposed of its remaining 225 shares of class A preferred stock, petitioner contends that such transactions constituted a redemption of stock by Blue Ribbon; that the distribution of and redemption of the stock was "essentially equivalent to the distribution of a taxable dividend"; that the amounts distributed to petitioner in redemption of the stock represented "a distribution of earnings or profits accumulated after February 28, 1913"; and that thus the amounts distributed to petitioner in redemption of the stock must "be treated as a taxable dividend" under section 115 (g) of the Revenue Act of 1934, the provisions of which are set forth in the margin.[1] Petitioner then contends that it was entitled to deduct the amounts so distributed to it in redemption of the stock as dividends received from a domestic corporation under section 23 (p) of the Revenue Act of 1934.

In the statement attached to the deficiency notice respondent determined that in the taxable year petitioner had sold the 225 shares of class A preferred stock in one transaction. In his brief respondent contends that petitioner sold the 225 shares of class A preferred stock in two transactions: A sale of 25 shares to Henry for $2,500 and a sale of 200 shares to Reynal for $15,000; and that such transactions did not constitute a redemption of the stock by Blue Ribbon.

The record conclusively shows that the transactions in which petitioner disposed of the 225 shares of class A preferred stock did not constitute a redemption of the stock by Blue Ribbon, but purchases of the stock by Henry (25 shares) and Reynal (200 shares) in accordance with their options "to purchase" the stock. It is significant that the document which was executed by petitioner at the time of the sale of the 25 shares to Henry and was attached to the certifi-

---

[1] SEC. 115. DISTRIBUTIONS BY CORPORATIONS.

(g) REDEMPTION OF STOCK.—If a corporation cancels or redeems its stock (whether or not such stock was issued as a stock dividend) at such time and in such manner as to make the distribution and cancellation or redemption in whole or in part essentially equivalent to the distribution of a taxable dividend, the amount so distributed in redemption or cancellation of the stock, to the extent that it represents a distribution of earnings or profits accumulated after February 28, 1913, shall be treated as a taxable dividend.

cate evidencing such shares expressly stated that petitioner had "sold" 25 shares to Henry and "that the purchase of such stock by Mr. Henry shall not be construed to prevent its future retirement" by Blue Ribbon.

In the light of the above analysis of the transactions in 1933 and the transactions in the taxable year, it remains to determine the basis of the 225 shares of class A preferred stock. Petitioner had acquired the 25 shares of class A preferred stock which it sold to Henry in the taxable year in exchange for 25 shares of its old preferred stock. In all petitioner had acquired 50 shares of class A preferred stock in exchange for its 50 shares of old preferred stock. This exchange was nontaxable under section 112 (b) (2) of the Revenue Act of 1932, and the basis of the 50 shares of class A preferred stock for determining gain or loss was the cost of the 50 shares of old preferred stock. The cost of the 50 shares of old preferred stock was $5,000. On June 14, 1934, Blue Ribbon paid to petitioner $2,500 in retirement of 25 shares of class A preferred stock which had been acquired in exchange for old preferred stock. No gain or loss resulted from such retirement. On November 30, 1935, in the taxable year, Henry paid to petitioner $2,500 in purchase of the remaining 25 shares of class A preferred stock which had been acquired in exchange for old preferred stock. Thus, as respondent concedes, no gain or loss resulted from such sale.

The 200 shares of class A preferred stock which petitioner sold to Reynal in the taxable year consisted of 22²⁄₉ shares which it had acquired from Reynal on the sale of its 50 shares of old common stock, and 177⁷⁄₉ shares which it had acquired as a dividend on its 50 shares of old common stock prior to the sale thereof to Reynal. On June 28, 1933, petitioner sold its 50 shares of old common stock to Reynal for $5,000 and 22²⁄₉ shares of class A preferred stock. For determining gain or loss on the sale the amount realized by petitioner from the sale was the sum of the money received plus the fair market value of the 22²⁄₉ shares under section 111 (b) of the Revenue Act of 1932. Thus the basis of the 22²⁄₉ shares for determining the gain or loss on the sale to Reynal in the taxable year was the fair market value of the shares on June 28, 1933. Respondent determined that the basis of the 22²⁄₉ shares was $2,222.22, and petitioner introduced no evidence to show a basis other than that determined by respondent.

Petitioner acquired the 177⁷⁄₉ shares of class A preferred stock as a dividend on its 50 shares of old common stock. The cost of the 50 shares of old common stock was $50. Under section 115 (f) of the Revenue Act of 1932 the stock dividend was not taxable. *Helvering* v. *Gowran, supra.* In the statement attached to the deficiency notice respondent determined that the basis for determining gain or loss on the sale of the 177⁷⁄₉ shares to Reynal was zero on the authority of

*Helvering* v. *Gowran, supra.* The deficiency notice was mailed prior to the enactment of the Revenue Act of 1939. In his brief respondent concedes that the basis of the 177⅔ shares should be $43.01 instead of zero, under section 214 (e) (1) of the Revenue Act of 1939 and under section 20 B.3 (2) of the regulations promulgated under section 214 (e) (1) in T. D. 4938, C. B. 1939–2, pp. 120, 123. Section 214 (e) (1)[2] is retroactive and provides in substance that the basis of new stock acquired as a dividend prior to January 1, 1936, is to be determined by allocating between the old stock and the new stock the adjusted basis of the old stock in accordance with the regulations promulgated under that section. Petitioner does not question the correctness of the allocation made by respondent under section 214 (e) (1) and the regulations promulgated thereunder.

However, petitioner contends that section 214 (e) (1) is not applicable. It relies on paragraph (3) of section 214 (e), which provides that paragraph (1) "shall not apply if the new stock was acquired in a taxable year beginning before January 1, 1936, and there was included, as a dividend, in gross income for such year an amount on account of such stock, and after such inclusion such amount was not (before the date of the enactment of this Act) excluded from gross income for such year." Petitioner argues that it included in its gross income for the fiscal year ended January 31, 1934, an amount on account of the 177⅔ shares and that such amount was not excluded from gross income for such year.

Petitioner's contention is without merit. The record indicates that petitioner did not include, *as a dividend*, in its gross income for its fiscal year ended January 31, 1934, an amount on account of the 177⅔ shares. Petitioner's income tax return for its fiscal year ended January 31, 1934, was not offered in evidence. Statements made by the attorneys for both parties at the hearing indicate that on its return for such fiscal year petitioner reported a profit of $24,950 from the sale of its entire interest in Blue Ribbon to Reynal. This amount of profit apparently was computed by adding together $5,000, the cash received from Reynal, and $25,000, the par value of the entire 250 shares of

---

[2] SEC. 214. BASIS OF STOCK DIVIDENDS AND STOCK RIGHTS.

\*        \*        \*        \*        \*        \*

(e) BASIS UNDER PRIOR ACTS.—The following rules shall be applied, for the purposes of the Revenue Act of 1938 or any prior revenue Act as if such rules were a part of each such Act when it was enacted, in determining the basis of property acquired by a shareholder in a corporation which consists of stock in such corporation, or rights to acquire such stock, acquired by him after February 28, 1913, in a distribution by such corporation (hereinafter in this subsection called "new stock"), or consisting of stock in respect of which such distribution was made (hereinafter in this subsection called "old stock") if the new stock was acquired in a taxable year beginning before January 1, 1936, \*  \*  \*

(1) The basis of the new stock and of the old stock, respectively, shall, in the shareholder's hands, be determined by allocating between the old stock and the new stock the adjusted basis of the old stock; such allocation to be made under regulations which shall be prescribed by the Commissioner with approval of the Secretary.

class A preferred stock acquired by petitioner, and by subtracting $5,050 as the cost of petitioner's entire interest in Blue Ribbon from the total of $30,000. Thus, it is clear that any amount included in petitioner's gross income for such fiscal year on account of the 177⅞ shares was included as profits and not as dividends. If any amounts had been included as dividends in petitioner's gross income for such fiscal year on account of the 177⅞ shares, such amounts would have been deductible as dividends received from a domestic corporation under section 23 (p) of the Revenue Act of 1932. Moreover, statements made by the attorneys for both parties indicate that petitioner's return for such fiscal year disclosed a net loss. The obvious purpose for the enactment of paragraph 3 of section 214 (e) was to eliminate any inequities which might arise from the application of the rule of allocation where the value of the new stock had been included as a dividend in gross income in the year of receipt. See Rept. No. 855, Committee on Ways and Means, 76th Cong., 1st sess., pp. 20–23. Even if it were assumed that the value of the 177⅞ shares had been included as a dividend in gross income in such fiscal year, the application of the rule of allocation will result in no inequities because of the net loss in such fiscal year. Cf. *Central Loan & Investment Co.*, 39 B. T. A. 981; *National Bank of Commerce of Seattle*, 40 B. T. A. 72.

Since section 214 (e) (1) is applicable, the total basis of the 200 shares of class A preferred stock which petitioner sold to Reynal in the taxable year was the sum of $2,222.22 (22⅞ shares) and $43.01 (177⅞ shares), or $2,265.23. Reynal paid $15,000 to petitioner for the 200 shares. Thus, petitioner realized a gain of $12,734.77 from the sale of the 200 shares to Reynal in the taxable year.

In view of the fact that petitioner realized no gain from the sale of the 25 shares to Henry in the taxable year, it realized a total gain of $12,734.77 from the sale of its remaining 225 shares of class A preferred stock of Blue Ribbon in the taxable year, as respondent concedes, instead of a total gain of $12,777.78 as originally determined by respondent in the statement attached to the deficiency notice. Respondent stated at the hearing that the reduction in the amount of the gain realized on the sale of the 225 shares from $12,777.78 to $12,734.77 caused a reduction in the amount of the deficiency in income tax from $2,331.80 to $2,325.89 and in the amount of the deficiency in excess profits tax from $529.07 to $526.92.

> *Decision will be entered that there is a deficiency of $2,325.89 in income tax and $526.92 in excess profits tax.*